**Kim SIX, Rose Marie Bouska, Carolyn L. Mobley, Shannon J. Martin, Kathy R. Givens, Vanda S. Wall, Carol Leann Demos, and Brenda G. Curry, Plaintiffs,**

v.

**Claudette HENRY, individually and in her official capacity as Treasurer of the State of Oklahoma, Defendant.**

No. Civ–91–1879–A.

United States District Court, W.D. Oklahoma.

June 22, 1992.

Charles J. Watts, Mark S. Cooper, Looney Nichols Johnson & Hayes, Rosemary M. Rogers, Shadid & Pipes, Oklahoma City, Okl., for plaintiffs.

Guy L. Hurst, Robert M. Anthony, Susan B. Loving, Office of the Attorney General, Oklahoma City, Okl., Kevin R. McLean, Belli Bolli Brown Monzione Fabbro & Zakaria, San Francisco, Cal., for defendant.

## ORDER

ALLEY, District Judge.

On 29 May 1992, this Court entered an Order denying plaintiffs' Motion to Compel the Continued Deposition of Defendant and finding that defendant's Motion to Continue Deposition was moot. This Order is intended to amplify the Court's view on the improper conduct of Mr. Charles Watts, who represents plaintiffs, during the deposition of defendant on 11 May 1992.

The nature of this case is that plaintiffs allege an impermissible separation from public employment in the state treasurer's office due to their politics. The portions of Fed.R.Civ.P. 26 that are pertinent to this Order are as follows:

**(b) Discovery Scope and Limits.**
Unless otherwise limited by order of the court in accordance with these rules, the scope of discovery is as follows:

(1) **In General.** *Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action,* whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party.... It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

*The frequency or extent of use of the discovery methods set forth in subdivision (a) shall be limited by the court if it determines that: ... (iii) the discovery is unduly burdensome or expensive, taking into account the needs of the case, the amount in controversy, limitations on the parties' resources, and the importance of the issues at stake in the litigation. The Court may act upon its own initiative after reasonable notice* or pursuant to a motion under subdivision (c) (emphasis added).

A number of courts have interpreted the language of Fed.R.Civ.P. 26 in a general manner and as it applies to the facts of a particular case. No general rule of thumb can be devised for what subject matter will be considered "relevant" in discovery, because the boundaries of relevance are necessarily vague. *See, Mallinckrodt Chemical Works v. Goldman, Sachs & Co.,* 58 F.R.D. 348, 353 (S.D.N.Y.1973); *United States v. Kohler Co.,* 9 F.R.D. 289, 291 (E.D.Pa.1949).

■ Nevertheless, the scope of discovery, including limitations on depositions and the use of protective orders, is clearly within the discretion of the trial judge. *See, Chemical & Indus. Corp. v. Druffel,* 301 F.2d 126, 129 (6th Cir.1962); *State of Maryland v. Pan–American Bus Lines, Inc.,* 1 F.R.D. 213, 214 (D.Md.1940). Further, if protection of a party is necessary, it can be provided more effectively by the discretionary powers of the court under Fed.R.Civ.P. 26(c) than by a constrictive concept of relevance. *See, Cox v. E.I. DuPont De Nemours & Co.,* 38 F.R.D. 396, 398 (D.S.C.1965).

Despite the relatively permissive view of relevance by the courts, it is axiomatic that discovery should not be allowed of information that has no conceivable bearing on the case. *See, In re Fontaine,* 402 F.Supp. 1219, 1221 (E.D.N.Y.1975); *In re Surety Ass'n of Am.,* 388 F.2d 412, 414 (2d Cir. 1967). *See also,* 8 Wright & Miller, *Federal Practice & Procedure,* § 2008 at 45–51 & § 2036 at 268.

As illustrated by the discussion above, the bounds of discovery, including depositions, may extend not only to admissible evidence, but also to evidence that is potentially relevant to the issues involved in the case. No principle of relevance or potential relevance, however, can justify the probes by Mr. Watts into the defendant's personal life. In fact, the Court finds that Mr. Watts' questioning was appalling. Questions that the Court finds objectionable are quoted below.

"Q. Ms. Henry, as you know, I'm Charles Watts. I represent the plaintiffs in this lawsuit. My intention today is to find out some about you and your personal background, kind of who you are and what your background is. And additionally, to find out what testimony you might be able to give that would be relevant to the allegations made in this lawsuit. (Henry Dep. at 4, 1.22–25 & 5, 1.1–3)

"Q. Were you married previous to Mr. Henry?

"A. I don't think I want to answer any questions that pertain to my personal life if it doesn't apply to this situation.

"Q. Well, as I explained to you at the outset, part of what we intend to do today is to find out about you personally. And if you—

"A. Public information, you're welcome to. My personal life, you're not welcome to.

"Q. My question is: Were you married previous to Mr. Henry?

"A. I do not care to discuss anything about my personal life.

"Q. Do you refuse to answer that question?

"A. I do. Absolutely.

"Q. I'll state on the record what I intend to do, I don't intend to call Judge Alley after each question that you refuse to answer, but I do intend to make a record on any questions that you refuse to answer, and I do intend to bring that up to the court. And if he should direct that those questions be answered, then we intend to also seek with that the cost of presenting that to the court.

"A. Well, I will remind you one more time, my personal family life has nothing to do with this and I am not going to get into it.

"Q. What was your previous husband's name?

"A. I am not going to answer.

"Q. You refuse to answer that question?

"A. Absolutely.

"Q. Have you previously been divorced?

"A. I am not going to answer any of this line of questioning.

"Q. Do you have children?

"A. I'm not going to answer any more questions on my personal life.

"Q. What are the names and ages of your children?

"A. I am not going to answer.

"(*Id.* at 8, 1.4–25 & 9, 1.1–15)

"Q. Where did you live when you went to the University of Oklahoma?

"A. In Oklahoma City.

"Q. Were you still living at home with your parents at that time?

"A. No.

"Q. How old were you?

"A. Probably late thirties, mid thirties, somewhere.

"Q. Did you just go for one semester?

"A. I believe—I believe it was two semesters concurrently.

"Q. Would that have been one full school year?

"A. Uh-huh. Yes.

"Q. So each semester you would have only taken, oh, six to seven and a half hours?

"A. Something like that.

"Q. Do you know what your grades were?

"A. Seems like I had around a three point.

"(*Id.* at 12, 1.18–25 & 13, 1.1–10)

"Q. And when did you attend Rose State?

"A. Various and sundry periods over probably a ten-year period.

"Q. From when to when, roughly?

"A. I would say maybe between '72 and '80, somewhere in that vicinity.

"Q. And what were you studying there?

"A. I was enrolled in business administration, so I took the general courses that were involved in that particular area.

"Q. Were you going to school while you were working?

"A. Yes.

"Q. What was your overall GPA?

"A. It was somewhere three point one or two. Somewhere in that range.

"Q. And at OSU Tech?

"A. I don't know, probably around—I would say around three point. It's been a long time. I don't remember for sure.

"(*Id.* at 15, 1.1–19)

"Q. What was your job?

"A. I was secretary to the vice-president.

"Q. Who was that?

"A. ... V....

"Q. Is he a friend?

"A. He was my employer back then.

"Q. I understand. My question is, is he a friend?

"A. Is he a friend—I mean, have we kept up with an acquaintanceship?

"Q. Yes, ma'am.

"A. Is that what you're asking me?

"Q. Yes, ma'am.

"A. No, we've not kept up any acquaintanceship.

"Q. Did you have any relationship with ... V ... at that time other than his secretary?

"A. No.

"(*Id.* at 20, 1.7–22)

"Q. What was your next employment— one other question. Did you have a supervisor at Stifel other than ... V ...?

"A. No.

"Q. Were you married during that time when you worked at Stifel Nicolaus?

"A. I will not discuss any of my personal live [sic].

"Q. You refuse to answer that?

"A. I do.

"(*Id.* at 22, 1.6–14)

"Q. Thank you. Were you living alone?

"A. I was supporting myself.

"Q. Were you living alone, is my question?

"A. No, not at that time.

"Q. Who were you living with?

"A. Is that relevant to anything, Guy?

"MR. HURST: Do you want to restate the question?

"MR. WATTS: Yes.

"BY MR. WATTS:

"Q. Who were you living with?

"MR. HURST: We'd object to the question, relevancy ground, not tending to lead to any matters relative to this case, or discovery of any matters relative to this case.

"MR. WATTS: Are you instructing her not to answer?

"MR. HURST: Yeah. Well, explain to me what the purpose of the question is?

"MR. WATTS: I want to know her background. And thus far, she's refused to answer a number of questions and we're just preserving those and this is part of knowing her background.

"(*Id.* at 26, 1.3–25)

"Q. While you were living—or while you were working for the Secret Service, who were you living with?

"Q. While you were working for New York Life, who were you living with?

"(*Id.* at 33, 1.12–13 & 1.22–23)

"Q. While you were working for the IRS, who were you living with?

"(*Id.* at 34, 1. 5–6)

"Q. Your husband was an IRS employee?

"A. Uh-huh.

"Q. What did he do?

"A. Criminal investigator.

"Q. From when to when?

"A. He was with the treasury department some 29 years, I believe.

"Q. Did you meet him at the IRS?

"A. No.

"Q. Did you meet him before or after you went to work for the IRS?

"(*Id.* at 40, 1.3–13)

"Q. How long were you in the Oklahoma House of Representatives?

"A. I served a term, so that would be until 1988.

"Q. One two-year term?

"A. Uh-huh.

"Q. Do you know how many roll call votes you made as a member of the Oklahoma House of Representatives?

"A. No.

"Q. Do you know how many you missed?

"A. No, I don't.

"Q. Can you give me any approximation?

"A. No.

"Q. Did you miss more than a hundred?

"A. I'm not going to guess. I'm not going to speculate. I said I do not know.

"Q. And you're exactly correct in not guessing. There may be times if for one reason or another we ask for an educated guess, but generally I'm sure counsel has told you not to do that and I would do the same thing. But let me ask: Do you have any knowledge at all whether you missed more than a hundred votes?

"A. I don't know.

"Q. You just have no knowledge at all?

"A. I'm saying I do not know. That is my answer.

"Q. Did you miss more than 150 votes?

"MR. HURST: Object to the question. She's already answered it. She doesn't know.

"BY MR. WATTS:

"Q. My question is: Did you miss more than 150 votes?

"A. I do not know. Can you understand that?

"Q. Do you have an opinion as to whether or not you missed more than 150 votes?

"A. No, I have no opinion.

"Q. Do you have an opinion on how many votes you made?

"A. No, I do not.

"(*Id.* at 41, 1.14–25 & 42, 1.1–23)

"Q. Had you thought about the Treasurer's race prior to that time?

"A. I thought about the Treasurer's office, but I had not anticipated to run.

"Q. Who were the largest contributors to your campaign.

"THE WITNESS: Without going back and looking at it, I couldn't say. It is a public record and it is on file with the Ethics Commission. And I'm sure you all, if you think this is political, have already pulled it and reviewed it.

"(*Id.* at 45, 1.3–8 & 1.15–19)

"Q. Have you ever been excommunicated from a church?

"MR. HURST: Object to the form to [sic] the question, relevancy.

"BY MR. WATTS:

"Q. Did you understand my question?

"A. I heard your question.

"Q. Have you ever been excommunicated from a church?

"(*Id.* at 51, 1.5–11)

"A. I have not been involved in any other lawsuits, period.

"Q. You've never been a party to a divorce action, then?

"A. I am saying one more time, I have not been involved in any lawsuits.

"Q. Well, listen [sic] the narrow scope of my question, Ms. Henry. Have you even been a party to a divorce action?

"A. I am not going to answer you anymore. I've given you my answer.

"Q. You refuse to answer that question?

"MR. HURST: She answered that question.

"MR. WATTS: No, she didn't. And if you'll let her testify, counsel, not you.

"MR. HURST: I'm not testifying.

"MR. WATTS: If you want to make an objection, it's fine, but—

"MR. HURST: Object to the form of the question.

"MR. WATTS: —then let her answer.

"BY MR. WATTS:

"Q. Do you refuse to answer whether or not you've ever been a party to a divorce action?

"A. My answer remains the same. I have never been involved in any lawsuits other than this.

"Q. My question is: Have you ever been a party to a divorce action?

"A. I'm not going to answer anything else.

"MR. HURST: Object to the form of the question. She's not a lawyer. I don't know that she knows what a divorce action is.

"BY MR. WATTS:

"Q. Have you ever been divorced? Yes or no, have you ever been divorced?

"A. I don't have to answer that.

"Q. You refuse to answer that?

"A. Yes.

"(*Id.* at 56, 1.9–25 & 57, 1.1–20)

"Q. We went through a number of different employments, Ms. Henry. I want to run back real quick and ask this one question.

"Were there any of those employments that you left where you were not in good standing?

"A. No.

"Q. And I'll go through just to make sure I've got an answer on each one. Del Rancho Drive-in?

"A. I left in good standing.

"Q. Southwestern Bell?

"A. I left in good standing.

"Q. Stifel Nicolaus?

"A. I left in good standing.

"Q. While you were at Stifel Nicolaus, did you have an affair with your boss?

"(*Id.* at 68, 1.4–18)

"Q. Are you saying that ... B ... had something to do with taking documents off?

"A. I'm just telling you that the documents were not there when we got ready to go look at them.

"Q. My question is: You're not saying that ... B ... had anything to do with carrying documents off, are you?

"A. The only person I believe I mentioned specifically was ... F....

"Q. My question is: You're not saying that ... B ... had anything to do with carrying documents off, are you?

"A. I have no knowledge that she carried them off. I am saying that the area she was quote, responsible for, documents were not there, they were missing.

"Q. But you have no knowledge that ... B ... had anything to do with that, do you?

"A. I have just stated as best I can.

"Q. So would that—the answer to that would be you have no knowledge?

"A. My answer is that I do not know specifically that she removed them, but they were in her area of responsibility.

"Q. Do you know generally that she removed them?

"A. I do not know specifically.

"Q. Do you know generally?

"A. Not without speculating.

"Q. Without speculating, do you have any knowledge whatsoever that ... B ... had anything to do with removing documents?

"A. You're asking me to speculate.

"Q. No, I'm not. I'm asking you for your knowledge. I said without speculating, do you have any knowledge, whatsoever, that ... B ... had anything to do with removing documents?

"A. I do not have general knowledge. And I have no specific knowledge.

"Q. You keep coming back and telling me, I don't have specific knowledge. I want to know whether you have any knowledge. I'm not trying to play a game with you, I'm trying to find out what your knowledge is.

"Do you have any knowledge, whatsoever, that ... B ... had anything to do with carrying off documents?

"MR. HURST: Object to the form of the question. I think she answered that. Her knowledge is the records were in that place where she was responsible for them and they're not there.

"MR. WATTS: You're reciting what she's saying for the record. If you want to make an objection, that's good, but she hasn't answered the question. She's beaten all around it.

"THE WITNESS: I've answered it.

"(*Id.* at 115, 1.9–25, 116, 1.1–25 & 117, 1.1–11)

"Q. Was ... R ... still in school at the time that you hired her in the Treasurer's office?

"A. Not that I'm aware of.

"Q. Was she already out of law school?

"A. She's, I don't believe, completed law school. I said she was in law school at one time.

"Q. Do you know how much she completed?

"A. Not right off hand.

"Q. Do you have any idea at all?

"A. I would say probably, this is speculation, an opinion, I think she needs about 12 to 16 hours to complete.

"Q. Do you know why she didn't complete law school?

"A. Not well enough to be able to give a reason here.

"Q. Do you have any understanding at all?

"A. Yes.

"Q. And what is that?

"A. It's not anything I feel comfortable giving here.

"Q. Well—

"A. Because I'm not real sure.

"Q. Has she told you why?

"A. We've discussed it.

"Q. What did she tell you?

"MR. HURST: Do you know the answer? Do you understand his question?

"THE WITNESS: I understand the question.

"BY MR. WATTS:

"Q. Okay, what did she tell you?

"A. Her studies were interrupted and she never went back to school.

"Q. Interrupted why?

"A. Because of a personal problem that took place.

"Q. And what was that?

"A. It had to do with someone attempting to rape her.

"Q. She told you that while she was a law student, she was the victim of an attempted rape and that caused her to quit school?

"A. It was a very traumatic experience.

"Q. Was the answer to that yes?

"A. Yes, it was a very traumatic experience.

"Q. Do you know of any other reason she did not complete school?

"A. No.

"(*Id.* at 137, 1.7–25 & 138, 1.1–24)

"Q. Why didn't you keep ... S ...?

"A. I just determined she was not someone I wanted to bring into my administration, so I did not hire her.

"Q. For what reason?

"A. I just didn't want to.

"Q. Well, specifically what did you not like?

"A. It didn't really matter whether I liked her or not. I just didn't want her to come on board with me. She worked for Royce Hunter. After looking this over, she was his right-hand person. She was keyed into sensitive areas and I just didn't want to bring her on board with me, so I did not hire her.

"Q. Now, what do you mean she was keyed into sensitive areas.

"A. She says—

"Q. You're looking at her resume?

"A. Yes, I'm looking at her resume. Administrative Assistant to the Chief of Staff. She said she provided secretarial and administrative support, including handling confidential budget and employee information, etc.

"Q. What was there about that that you thought disqualified her?

"A. I just did not want to hire her.

"Q. Well, what was there about that that made you not want to hire her?

"A. I don't know if it's appropriate for me to ask a question here, but I have never known of an employer, or a potential employer, going through an interview process with someone and then have to go back and remember two years earlier why you did or did not want to hire someone. I did not want to hire her.

"Q. Now, back to the narrow scope of my question, Ms. Henry: Why, what was it about the fact that she handled confidential employee and budget information or that she was Royce Hunter's assistant and keyed into sensitive areas? That's what you told me. And what was it about that that caused you to not want to hire her?

"A. Just the fact that she had worked and been his administrative assistant and was privy to everything that would be going on in the office. I just chose not to bring her on board with me.

"Q. And why would you do that?

"A. Because I just chose to do it.

"Q. You thought she wouldn't be loyal to you?

"A. There's always that possibility.

"Q. Well, is that—

"A. That's your words.

"Q. I'm asking you, I'm trying to find out. Is that what the problem was; is that what you're telling me when you say that she was his assistant and keyed into sensitive areas, that you were afraid she wouldn't be loyal to you?

"A. It would be a possibility that that could be the case.

"Q. Was that your concern?

"A. Not the major concern.

"Q. What was the major concern.

"A. The major concern is I just didn't want to hire her. I don't have to give a reason why I do or do not hire somebody.

"Q. You do if there is a reason. And I—

"A. Well, there is no major reason, I'm telling you. I just didn't want to hire her.

"Q. Did you not like the way she looked?

"A. I don't have anything else to answer on it. I don't know how else to tell you. I just didn't want to hire her.

"Q. All you've got to do is answer the question.

"A. I did.

"Q. Did you not like the way she looked?

"A. I did not want to hire her.

"Q. Did you not like the way she looked?

"A. I did not want to hire her.

"Q. My question is: Did you not like the way she looked?

"MR. HURST: If you don't know, say you don't know.

"THE WITNESS: I don't know. I just said I didn't want to hire her.

"BY MR. WATTS:

"Q. I've heard you say that and I want to know why. And if you don't—

"A. I cannot elaborate on it.

"Q. Well, are you saying you just arbitrarily singled her out for no reason?

"A. (No audible response.)

"Q. Hello?

"A. I'm here. I just don't know how many ways that you can ask me the same question, how many ways I can give you the same answer.

"Q. Well, I can ask it I guess until I get an answer. I want to know—

"A. The answer is, I did not hire her just because I did not want to hire her.

"Q. Well, I've heard you say that and I'm wondering—I want to know why. I want to know what it was about ... S ... or about her background that caused you not to want to hire her, other than the fact that you were concerned whether she would be loyal. A moment ago you said yes, that was one thing, but that was not the major reason. And I want to know the major reason.

"A. Again, I mentioned the fact that she was Royce's Administrative Assistant, she was keyed into everything that had been going on in the prior administration. I was not wanting to bring her into my administration, period.

"Q. So is that the major reason?

"A. Probably.

"(*Id.* at 183, 1.20–25, 184, 1.1–25, 185, 1.1–25, 186, 1.1–25 & 187, 1.1–25)"

Plaintiffs' Motion to Compel presents one basic question: will the Court grant more time for defendant Henry's deposition? This Order presents one basic answer: no. The rambling, repetitious questions quoted above, although occasionally marginally relevant, demonstrate that too much time has already been wasted. Those quotations are only representative and not comprehensive.

Through his conduct, Mr. Watts has abused the discovery process. He should also heed Oklahoma Rule of Professional Conduct 4.4, in that his questions had "no substantial purpose other than to embarrass, delay, or burden" defendant Henry. This will not provide more opportunity for Mr. Watts to conduct a deposition along these lines.

Those who abuse the discovery process must demonstrate why they should be entitled to benefit from it. Accordingly, in view of the way Mr. Watts handled the questioning here, not later than ten (10) days from the date of this Order, he must show cause why he should not be barred from using defendant Henry's deposition for *any* purpose at trial.

It is so ordered.